IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AURELIA EMILY ALLBERT, | AT LAW AND IN ADMIRALTY |
| Plaintiff, | No. |
| vs. | PLAINTIFF'S COMPLAINT |
| HAL NEDERLAND N.V., a Curacao corporation, HOLLAND AMERICA LINE, N.V., a Curacao corporation, dba HOLLAND AMERICA LINE N.V., LLC, a foreign corporation, HOLLAND AMERICA LINE-USA INC., a Delaware corporation, and HOLLAND AMERICA LINE, INC., a Washington corporation, and DOES INC. 1-3, and JOHN DOES 1-3, | |
| Defendants. | |

COMES NOW PLAINTIFF AURELIA EMILY ALLBERT, by her undersigned counsel of record, and for Complaint against defendants herein alleges as follows:

**The Parties**

1. Plaintiff Aurelia Emily Allbert (hereinafter "plaintiff" or "Ms. Allbert") is and was at all relevant times a Canadian citizen and a resident of New York, New York. At all relevant times she was a passenger aboard the cruise motor vessel Zuiderdam owned and operated by one or more of the Holland America defendant entities (hereinafter collectively

PLAINTIFF'S COMPLAINT - 1

Law Office of James F. Whitehead
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

identified as "HAL"), and/or an involuntary resident/patient of Le Centre Hospitalier de la Polynesie francaise in Tahiti for more than a month, and/or an involuntary resident at shelters in Papeete, Tahiti.

2. On information and belief, the M/V Zuiderdam was owned by defendant Hal Nederland N.V., a Curacao corporation, and operated by HAL, or Holland America Line N.V., a Curacao corporation. Alternatively, the vessel was owned and/or operated by one or more of the other named Holland America defendant entities, all of whom are associated with the cruise line business and are believed to transact business in this district and be subject to this Court's jurisdiction.

3. If individuals working on the M/V Zuiderdam are ultimately determined to have been independent contractors as opposed to employees of the HAL defendants, their actual employers are preliminarily identified as DOES INC. and JOHN DOES defendants. They are named herein to the extent they are considered employers of the aforesaid individuals, and to the extent they may have caused or contributed to plaintiff's injuries and damages by their own acts or omissions. If and when such persons or entities are identified, the pleadings may be amended, as necessary and appropriate.

**Jurisdiction and Venue**

4. This is a case of admiralty and maritime jurisdiction, within the provisions of 28 U.S.C. §1333 as hereinafter more fully appears, and is an admiralty and maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure. Plaintiff believes and alleges this Court also has diversity jurisdiction over this cause pursuant to 28 U.S.C. §1332, as hereinafter more fully appears: plaintiff is a resident of New York State, and all of the known defendants are

PLAINTIFF'S COMPLAINT - 2

Law Office of James F. Whitehead
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

believed to be residents of states or foreign countries not including New York State. Plaintiff's claim exceeds $100,000.00. Venue is appropriate in this district pursuant to 28 U.S.C. §1391 as it is the residence of one or more of the principal HAL defendant entities and is the venue dictated by the terms of the ticket of passage provided to plaintiff for the subject voyage.

**Factual Background**

5. On or about February 27, 2022, Ms. Allbert boarded the Zuiderdam in San Diego, California, embarking on an advertised 35-day round-trip voyage to Hawaii and Tahiti. Shortly after departing San Diego, Ms. Allbert befriended several women who, like her, were traveling alone, but also was a victim of unwanted sexual assaults by men employed by, or affiliated with, HAL. Those incidents troubled her greatly, but she was uncomfortable reporting the incidents to vessel management, and did not do so. Her hopes for a wonderful cruise were also spoiled by HAL's inattentive and disrespectful response to complaints she made to vessel management about a number of concerns, including a report that the mini-fridge in her cabin was no longer functioning, water was leaking through a wall in her cabin, the neighboring cabin was extremely noisy, and she was having problems with her security access card that was her ticket to leave, or return to, the vessel on port calls. The security manager was very difficult and disrespectful and refused her request for a workable card. She concluded that perhaps she was a victim of racial discrimination because while she is a Canadian citizen, she was born and raised in China.

6. In addition to the preceding complaints, plaintiff was very disturbed by the vessel's confiscation of a small number of bottles of special alcoholic beverages including champagne that she had purchased ashore and intended to sell to customers when she returned

home, which was one of the activities from which she made a living. The products were confiscated by the vessel citing their alcohol policy, but their current policy did not warrant confiscation. Plaintiff repeatedly asked that the samples be returned to her, but defendants refused. She had not purchased the wine to avoid paying for vessel alcoholic beverages. She made repeated requests to speak with the Captain about this issue, but the Captain refused to see her.

7. Following her complaints about the condition of her cabin, frustration over her malfunctioning security access card, confiscation of the alcoholic beverage samples, and the other concerns cited above, and the vessel's disrespectful refusal to address her complaints in a serious way, on or about March 17, 2022, plaintiff felt that she needed to do something dramatic to get management's attention. During a time when the vessel was moored at a dock in Raiatea, she climbed over a rail onto a narrow platform on Deck 3 on the water side of the rail, and with a firm grip on the rail she waited for a member of the crew to come out and ask her what she was doing. It took a while, but the Staff Captain and other members of the crew came to her location after about 45 minutes and brought her back on deck and sat her down to hear her complaints. She was able to articulate many of her concerns, but she continued to feel greatly disrespected. She asked for water while they were questioning her, and they refused to provide any. She also asked if she could be allowed to eat after they had her sit on the deck for hours, as it was already 7:30 p.m., and the hotel manager told her she could only eat in his room, not on the deck she had requested. She turned him down and was then told she should plan to leave the vessel that night, find her own hotel on shore, book a flight back to the U.S., and get a new Covid-test. She was escorted back to her cabin to pack. During her packing, however, the medical center doctor, Le

Roux Viljoen, came to her cabin and despite her having been told she must leave the vessel that evening, told her that if she didn't go to the medical center right away, he would forcibly arrange it himself. She was afraid of his threat and asked to talk to the police, but her requests were refused. When she asked to speak with her husband, who had remained in New York City due to an extraordinarily busy work schedule, she was again refused. She asked to speak with her friends on the vessel and was again denied that option. At that point Dr. Viljoen told her that if she would go to the medical center to have her blood tested, she could return to her cabin to continue packing and leave the ship that night. Per Dr. Viljoen's offer, despite being afraid of what might happen in the medical center, Ms. Allbert did go to the center. Once inside, Dr. Viljoen gave her an injection without her consent, and she passed out. The last thing she heard was the Security Manager, Darin, asking a security staff member to turn off his body camera.

8. Ms. Allbert had, she believes, been sedated, but whatever the injection was, she had certainly not consented to it, and she was held there against her will, on information and belief for five days and nights. She repeatedly asked to change her clothes but was refused. On information and belief, pending further investigation, plaintiff believes she was injected with a first generation anti-psychotic drug called Haldol, and other drugs without her consent. On information and belief she was diagnosed as suffering from mania with psychotic symptoms, referring apparently to her climbing to the other side of the deck rail to get their attention when they refused to respond to her legitimate complaints. On information and belief, the chief medical officer, Dr. Viljoen, was not a psychiatrist and was not trained adequately to diagnose any mental condition plaintiff might have had, but Dr. Viljoen reportedly consulted with an osteopath in Miami, Florida, Eliza Karwowski, who reportedly had some training in psychiatry,

PLAINTIFF'S COMPLAINT - 5

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

and she and Dr. Viljoen apparently agreed on a diagnosis that would justify Ms. Allbert's detention. Dr. Karwowski described the protest on Deck 3 as evidence of suicidal plans and misinterpreted statements Ms. Allbert had made, perhaps because she did not understand Ms. Allbert's accent when speaking English. There is no credible evidence that Ms. Allbert intended to do harm to herself or others, and if she had intended to harm herself, she could easily have jumped from the platform she was standing on outside the rail on Deck 3 while waiting for staff members.

9. During her detention in the medical center, plaintiff asked permission to get out on the deck for sun, but she was only allowed to do that once for about twenty minutes. She also requested an opportunity to call the French police but was refused. On March 22, 2022, Dr. Viljoen ordered an ambulance to take her to the emergency room of the psychiatric hospital in Papeete. He asked her to sign a payment agreement for HAL's costs in caring for her in the medical center, but she refused, and they charged her anyway. French doctor Dr. Yuri Costa called the Zuiderdam and was told that its insurance would pay for her return home to New York, but HAL on information and belief took no steps at that time to make that happen. As a result, Ms. Allbert remained in the French psychiatric hospital for six and a half weeks, where she was subjected to awful, depressing conditions, including patients frequently yelling and/or crying in anguish through the thin walls that separated her from them, as well as seeing evidence of patients' fecal incontinence and uncontrollable facial or body movements. One patient died because her heart unexpectedly stopped beating. While still at the hospital Ms. Allbert was raped by a staff member on April 9 and April 16, which was reported to the police. She was released from the psychiatric hospital on or about May 2, 2022, on a clean bill of health. She had

PLAINTIFF'S COMPLAINT - 6

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

been monitored at the hospital but had never been given medications of any kind, as on information and belief the doctors did not think she needed any and never saw any reason to diagnose mental issues of any kind or suicidal behaviors. From there, without funds to buy her way home (as HAL had charged her credit card approximately $16,000 for care in the medical center, in addition to the roughly $14,000 they had charged her for the cruise), French Social Services placed her in two shelters on Tahiti for another six and a half weeks. During that time period, she was raped by a local on probation.

10. During her forced stay in Tahiti, Ms. Allbert was not allowed to go outside but did get one phone call a day. She managed to request that HAL and its agent in Tahiti help her to return home, but they ignored her requests. When she finally was promised a ticket to fly her to Newark, New Jersey, it was the result of efforts by French immigration police who required that a Holland America agent purchase the ticket. That eventually came to pass but not until June 17, 92 days after she had been told to pack her bags and arrange her own flight home.

11. Plaintiff was penniless when she was admitted to the psychiatric hospital as HAL charged her credit card many thousands of dollars for care in the vessel's medical center in addition to the cost of the cruise, as described in paragraph 9 above, and she was as a result unable to afford to buy her way out of the hospital and back home to New York. On information and belief, the hospital billed plaintiff $89,000 for her involuntary confinement there despite an absence of any justifiable reason for her being there. On information and belief Ms. Allbert had no prior history of mental health concerns or treatment.

### First Claim: Breach of Contract Against HAL

12. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11 above.

13. Plaintiff and defendant HAL entered into a contract for plaintiff's 35-day cruise to Hawaii and Tahiti. In consideration of plaintiff's payment for the cruise, HAL promised to provide her an extraordinary experience, as they did with all passengers, including an implied promise to be attentive to the customers' needs, to provide adequate medical care to passengers, and a host of cultural and other topics. On its website it states that "every Holland America Line employee is committed to providing a truly extraordinary experience for our guests. We look forward to welcoming you aboard." Defendants breached their contract and proximately caused Ms. Allbert to suffer significant damages as described elsewhere in this Complaint.

### Second Claim: Negligence Against HAL

14. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11 and 13 above.

15. In addition to their contractual obligations to their passengers, HAL also owed their passengers a duty to provide safe passage and to ensure that their passengers were not exposed to acts of aggression, including unwanted sexual advances, or discriminatory treatment. They also had a duty to train and supervise their employees, and also any independent contractors who may have had interactions with passengers on the vessel, to treat the passengers respectfully and equally. The HAL defendants breached this duty by either inadequate training or supervision of their employees and independent contractors, and they knew or should have known that staff members or others affiliated with the management of the vessel were engaged in

acts of sexual assault and battery against women on that cruise. Defendants' acts and/or omissions proximately caused Ms. Allbert significant stress and fear and made her feel very disrespected. Further, the treatment Ms. Allbert experienced at the hands of the doctor in charge of the medical center, as more fully explained in paragraphs 7-9 above and in paragraph 19 below should be considered at least in part the fault of the HAL defendants.

### Third Claim: Negligence Against DOES INC. and JOHN DOES

16. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11, 13, and 15 above.

17. If, as expected, defendants allege that many of the men and women employed on the vessel were not HAL employees but rather independent contractors, the ones who treated Ms. Allbert badly were nonetheless under the control of the HAL defendants, who were responsible for the acts of those workers. To the extent HAL does prove that any of the workers plaintiff asserts harmed her by aggressive or unwelcome behaviors were entirely independent, plaintiff asserts that those workers either intentionally (see claim for Intentional Infliction of Emotional Distress below) or through negligence caused plaintiff harm, and their legal employers should be held accountable for their acts or omissions. They owed Ms. Allbert a duty to treat her respectfully and not discriminate against her in any way, and they owed her a duty not to sexually assault her. They breached those duties and proximately caused her significant damages.

### Fourth Claim:  Unlawful Imprisonment

18. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11, 13, 15, and 17 above.

19. When on March 17 Ms. Allbert was escorted to the vessel's medical center without her consent, shortly after she had been told by vessel officers that she should pack her things and disembark from the vessel that night, she was frightened. On information and belief she was held in the medical center for five days and five nights, without her consent and in defiance of her complaints and requests for opportunities to call her friends on the vessel and her husband, or even to be allowed to spend daily a few minutes outside in the sun. That restraint was unlawful imprisonment. The vessel's doctor, who was in charge of the medical center, had no authority to arrest or imprison plaintiff, and his actions and decisions to restrain her were an unlawful violation of her right of personal liberty and proximately caused her to suffer significant damages.

**Fifth Claim: Assault and Battery**

20. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11, 13, 15, 17, and 19 above.

21. The sexual assaults and unwelcome sexual advances constituted assault and battery. Also, as indicated in paragraph 19 above, plaintiff's being restrained and imprisoned in the medical center, and being given an injection to which she had not given consent, also constituted assault and battery. Those acts proximately caused her great anxiety. When she was escorted off the vessel and registered in a psychiatric hospital in Papeete, Tahiti, the HAL defendants knew or certainly should have known that it was demeaning and dangerous to leave Ms. Allbert in such a hospital. She was raped twice at the hospital and again at a shelter to which she was transferred after the doctors at the hospital had satisfied themselves that she was not a danger to herself or others, but on information and belief HAL had charged her credit card

PLAINTIFF'S COMPLAINT - 10

Law Office of James F. Whitehead
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

for so-called medical services, leaving her card with a zero balance and making it impossible for her at that time to pay her way home. The rapes at the hospital and shelter were the result of HAL's diagnosis of mania and suicidal behaviors and their decision to leave her at the hospital, and HAL had a duty to know whether it was safe to leave a passenger in a place to which she had not consented to be taken and which she was helpless to leave after her money had been taken, particularly because Tahiti was the destination for the cruise and on information and belief a place HAL should have been familiar with. The choice to leave her at the hospital was at a minimum negligent, involving a duty to protect the passenger, breach of that duty, and a proximate cause of great anxiety, fear, and damage to her sense of self and expectation of safety.

### Sixth Claim: Intentional Infliction of Emotional Distress

22. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11,13,15,17, 19, and 21 above.

23. Defendants' wrongdoing to plaintiff can be characterized in several different ways, including negligence and gross negligence, but the most likely conclusion is that they did not like her because she is a free spirit and an assertive woman, or perhaps because she is Chinese, and so they intentionally made life miserable for her during the cruise. The security guard's inexplicable refusal to issue her a functional access card to get on and off the vessel, the doctor's far-fetched diagnosis that she might do harm to herself or others and therefore needed to be imprisoned in the medical center, the decision to move her to a psychiatric hospital when she had already requested that she be flown home to New York and defendants had actually instructed her to do so before keeping her in the medical center, and their failure to attend promptly to her complaints of a malfunctioning mini-fridge and leaks of water into her cabin, as well as their

confiscation of bottles of beverages she intended to take home to sell as product samples, and their charge to her credit card for a preposterous bill for services while they restrained her in the medical center, all indicate that their treatment of her was retaliatory and intentional. Those acts proximately caused her enormous stress and anxiety and, per a diagnosis after her ordeal, post-traumatic stress disorder.

### Seventh Claim: Conversion/Theft

24. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11, 13, 15, 17, 19, 21, and 23 above.

25. Plaintiff also asserts a claim for conversion/theft for HAL's confiscation of her purchase of bottles of specialty beverages, and their charge against her credit card without her consent, or any other justification, for her imprisonment on the vessel, as noted above. Those acts proximately caused her significant financial harm and also emotional distress and anxiety and PTSD when she must have wondered if she would ever get home.

### Eighth Claim: Medical Malpractice

26. Plaintiff repeats and realleges and incorporates herein, as if fully set forth in this section, the allegations of paragraphs 1-11, 13, 15, 17, 19, 21, 23, and 25 above.

27. Plaintiff asserts that the diagnosis of mania and suicidal behaviors justifies inclusion of that diagnosis as evidence of defendants' Intentional Infliction of Emotional Distress, in part because it is difficult to believe that competent doctors would have actually ever made that diagnosis. However, if they did sincerely believe it was accurate, then in the alternative plaintiff claims that Drs. Viljoen and Karwowski obviously owed plaintiff a duty of competent care but failed to exercise the requisite standard of care in reaching that diagnosis,

which resulted in imprisonment on the vessel with accompanying stress, anxiety, and fear, and also, subject to the evidence adduced during formal investigation and discovery, may be shown to have proximately caused further significant damages, including PTSD, and enhanced damages of insecurity and loss of self esteem during plaintiff's enforced stay at the psychiatric hospital and thereafter the shelters in Papeete, Tahiti.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

A. For judgment against all defendants found liable for causing plantiff harm in amounts to be proven at the time of trial;

B. For prejudgment interest and statutory and reasonable attorney fees and costs in such amounts as the Court may deem proper and just; and

C. For such other and further relief as the Court may deem appropriate.

DATED at Seattle, Washington, this 20th day of January, 2023.

LAW OFFICE OF JAMES F. WHITEHEAD

*[signature]*

James F. Whitehead, WSBA#6319
Attorney for Plaintiff