HON. THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AURELIA EMILY ALLBERT, a citizen of Canada and a resident of New York,<br><br>Plaintiff,<br><br>vs.<br><br>HOLLAND AMERICA LINE, N.V., a Curacao corporation, FRISO KRAMER, LE ROUX VILJOEN, JIM MCPARLAND, AND CHRIS "DOE,"<br><br>Defendants. | No. C23-0093 TSZ<br><br>PLAINTIFF'S SECOND AMENDED COMPLAINT |

COMES NOW PLAINTIFF AURELIA EMILY ALLBERT, by her undersigned counsel of record, and for Second Amended Complaint against defendants herein alleges as follows:

**The Parties**

1.      Plaintiff Aurelia Emily Allbert (hereinafter "plaintiff" or "Aurelia") is and was at all relevant times a Canadian citizen and currently a resident of New York.  At all times she was a passenger aboard the cruise motor ship ZUIDERDAM owned and operated by defendant Holland America Line, N.V. (hereinafter identified as "HAL") and/or an involuntary resident/patient of Le Centre Hospitalier de la Polynesie francaise in Tahiti for more than six weeks and an involuntary resident at shelters in Papeete, Tahiti.

PLAINTIFF'S SECOND AMENDED COMPLAINT - 1

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

2. On information and belief, the M/S ZUIDERDAM was owned and/or operated by defendant Holland America Line N.V., a Curacao corporation ("HAL").  Defendant HAL is associated with the cruise line business and on information and belief transacts business in this district and is subject to this Court's jurisdiction.

3. On information and belief, defendant FRISO KRAMER was at all relevant times the captain of the M/S ZUIDERDAM on the cruise referenced in paragraph 1 hereinabove.  As Captain of the ship, he was responsible in many ways for the behavior and performance of the vessel's crew.

4. On information and belief a young man named CHRIS (last name not yet known pending formal discovery) was an employee or independent contractor for the M/S ZUIDERDAM on the referenced cruise, responsible for food and beverage supply to the passengers on the vessel.

5. Defendant JIM MCPARLAND was on information and belief a hired lecturer on geology who sailed with the vessel and lectured to interested passengers during the referenced cruise.

6. LE ROUX VILJOEN was on information and belief the chief of the ZUIDERDAM's medical center and was identified by the ticket of passage as an independent contractor, not an employee.

**Jurisdiction and Venue**

7. This is a case of admiralty and maritime jurisdiction, within the provisions of 28 U.S.C. §1333 as hereinafter more fully appears, and is an admiralty and maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure.  Plaintiff believes and alleges this Court

PLAINTIFF'S SECOND AMENDED COMPLAINT - 2

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

also has diversity jurisdiction over this cause pursuant to 28 U.S.C. §1332, as hereinafter more fully appears: plaintiff is a citizen of Canada and a resident of New York State, and all of the known defendants are believed to be residents of foreign countries or states not including New York State.   Plaintiff's claim exceeds the threshold amount for diversity jurisdiction.  Venue is appropriate in this district pursuant to 28 U.S.C. §1391 as it is a principal place of business of defendant HAL and is the venue dictated by the terms of the ticket of passage provided to plaintiff for the subject voyage.

## Factual Background

8. On or about February 27, 2022, Aurelia boarded the ZUIDERDAM in San Diego, California, embarking on an advertised 35-day round-trip voyage to Hawaii and Tahiti.  She traveled alone, as her husband was recuperating from knee surgery and could not join her.  During the early days of the cruise, she met defendant Jim McParland, who was traveling on the cruise as a paid lecturer.  At one point Mr. McParland borrowed a book from her and then some time later returned the book to her cabin one evening and asked if he could come in.  She was reluctant but did not expect trouble of any kind, but after entry he made it clear he wanted to have sex with her.  She objected repeatedly and asked him to leave, but he persisted and forced himself on her.  She felt she had made her position clear and was shocked by his behavior.

9. On another occasion a young man named Chris, who was on information and belief a Food and Beverage Manager on the vessel, found himself briefly alone with Aurelia in one of the cabanas.  He took her hand and placed it on his genitals and asked if she wanted more.  She was shocked and said she was not interested and hurried away from him.

10. During the cruise plaintiff had a number of complaints about her cabin that she communicated to vessel management, including a complaint that the mini-fridge in the cabin was not functioning, and food in it had spoiled, in addition to water leaking through a wall to her cabin, and excessive noise from an adjacent cabin. The response to her complaints was slow, and she tried to make an appointment to speak with the vessel Captain, defendant Friso Kramer, but when she went to his cabin, the Staff Captain told her she could not speak with the Captain and slammed the door in her face.

11. Frustrated at the lack of a reasonable response to her complaints, plaintiff decided she needed to do something dramatic to get the Captain's attention. On March 17, 2022, late in the afternoon at a time when the vessel was moored to a dock in the port of Raiatea, she climbed over a rail on the third deck and stood on a ledge on the water side of the rail. She had no intention of hurting herself or others, hoping only to draw attention to her complaints and be afforded a hearing with the Captain or his designee. Perhaps 45 minutes after she started her protest, the Staff Captain and other members of the crew appeared on that deck and pulled her back over the rail and then sat with her to listen to her complaints. At one point she asked for water while they were questioning her, but they refused to provide any. She also said she needed to eat dinner but was told by the hotel manager that she would only be allowed to eat in his room, not on the deck she had requested. For a period of time all but one of the crewmen departed, leaving only one young man with her, who watched her from a relatively short distance, but at any time she could easily have jumped from the vessel had she wanted to do so.

12. After a while some of the men returned to the deck, and the Hotel Manager told her that she should plan to leave the vessel that night, find her own hotel on shore, book a flight

PLAINTIFF'S SECOND AMENDED COMPLAINT - 4

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

back to the U.S., and get a new Covid test. She was eventually escorted back to her cabin to pack, accompanied by several men who waited for her to pack in her cabin. During her packing, however, the doctor in charge of the vessel's medical center, defendant Le Roux Viljoen, came to her cabin and despite her having been told that she must leave the vessel that evening, told her that if she didn't go voluntarily to the medical center right away so he could draw some of her blood, he would forcibly arrange it himself. She was afraid of his threat and asked to talk to the police, but her requests were refused. When she asked to speak with her husband, she was refused. She then asked to speak with her friends aboard the vessel but was again refused. On information and belief, the doctor told her that if she would go to the medical center to have her blood tested, she could return to her cabin to continue packing and leave the vessel that night. Despite fearing what would happen in the medical center, plaintiff did go to the center after requesting that she be accompanied there by a passenger, and they allowed an older woman to accompany her to the center but did not allow the escort entry to the center.

13. Once inside the medical center, the doctor gave Aurelia an injection without her consent, and she passed out. Shortly before she lost consciousness, she recalls hearing the security manager, Darren, asking a security staff member to turn off his body camera.

14. Aurelia had, she believes, been sedated when she received an injection in the medical center. Rather than allowing her to return to her cabin to pack, she was held against her will at the medical center for five days and five nights. She repeatedly asked for permission to change her clothes but was refused. After being there a few days, they finally allowed her to take a shower. According to the medical center's records, she had been injected with haloperidol, midazolam, and promethazine. She was questioned by Dr. Viljoen and then by a female doctor in

PLAINTIFF'S SECOND AMENDED COMPLAINT - 5

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

Florida, who interviewed Aurelia by remote video and according to their records diagnosed Aurelia as suffering from mania with psychotic symptoms, referring apparently to her climbing to the other side of the deck rail to get their attention when they would not listen to her complaints. On information and belief, the chief medical officer, defendant Le Roux Viljoen, was not a psychiatrist and was not trained adequately to diagnose any mental condition plaintiff might have had, and the doctor in Florida with whom he consulted was on information and belief an osteopath who reportedly had some training in psychiatry. The Florida doctor, Eliza Karwowski, DO, described plaintiff's protest on Deck 3 as evidence of suicidal plans.

15. During her detention in the medical center, Aurelia asked for permission to get out on the deck for some sun, but to the best of her recollection was only allowed to do that once for about twenty minutes. She also requested permission to call the French police but was refused. On March 22, 2022, Dr. Viljoen, or someone acting at his direction, ordered an ambulance to take plaintiff to the emergency room of the psychiatric hospital in Papeete, Tahiti. Dr. Viljoen asked plaintiff to sign a document agreeing to HAL's charges for her care in the medical center, but she refused to sign, and on information and belief they charged her credit card anyway. On information and belief, French doctor Dr. Yuri Costa called the ZUIDERDAM from the hospital where Aurelia had been taken and was told that HAL would pay for her return home to New York, but HAL on information and belief took no steps at that time to make that happen. As a result Aurelia remained in the French psychiatric hospital for six and a half weeks, where she was held in a locked room but nonetheless raped twice by a young male nurse named Arnaud Callaert, once on April 9, 2022, and once on April 16, which was reported to the local police. Aurelia was released from the psychiatric hospital on or about May 2, 2022, on information and belief with a

clean bill of health. Although nurses had offered to provide her medication of some type, she had declined their offers and never taken any medication voluntarily while she was at the hospital. On information and belief, she had been monitored at the hospital, and the doctors never saw any evidence of mental or physical disease and saw no reason to diagnose mental issues of any kind or suicidal behaviors.

16. After being discharged from the hospital Aurelia had no credit left on her credit card and no funds to plan her way home. She learned that HAL had charged her card a little more than $16,000.00 for her unconsented care in the medical center in addition to the roughly $14,000.00 they had charged her for the cruise. She also learned after she was discharged from the hospital in Tahiti that the hospital had charged her roughly $89,000.00 for her time there. That bill has been disputed, but Aurelia has already paid $9,000.00 of the $89,000.00 bill submitted. After she was released from the psychiatric hospital, French Social Services placed Aurelia in two shelters on Tahiti for another six and a half weeks. During that time period, she was raped by a local man named Mr. Vahiana Cowan. She pressed charges in Tahiti against Mr. Callaert (see paragraph 15 above) and Mr. Cowan. Finally, with the help of HAL's Tahiti port agent, arrangements were made to return Aurelia to New York, and she flew back home on or about June 17, 2022, more than two months after she would have returned home had she been allowed to stay on the ZUIDERDAM for the duration of the cruise for which she had paid.

17. Aurelia suffered significant damages from her extraordinary ordeal, including, but not limited to, fear, great anxiety, disrespect and contempt, arising from the nonconsensual sexual assaults and batteries, her imprisonment in the vessel's medical center, her unnecessary hospitalization ashore, and her financial losses, including extraordinary charges for her restraint in

PLAINTIFF'S SECOND AMENDED COMPLAINT - 7

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

the vessel's medical center and lengthy stay at the psychiatric hospital, theft/conversion of the alcoholic beverages she had purchased in ports of call for sale in her business back home in New York, and significant lost earnings from her inability to conduct her Airbnb business and her wine importation business during the time she spent involuntarily in the hospital and two shelters in Tahiti.

18.   On information and belief Aurelia had no prior history of mental disease before the subject cruise. Following her return home, she sought the assistance of psychiatrists and a psychologist in New York City for PTSD, which was attributed to her experiences on the vessel and the time spent against her objections in the hospital and shelters ashore.

19.   In addition to her PTSD and memories of her rapes, false imprisonment by Dr. Viljoen, and her anxiety and isolation, she also suffered financial losses described briefly in paragraph 17 above that she calculates as totaling more than $142,000.00. She is claiming for the value of the portion of her paid-for cruise that she never had a chance to finish or enjoy (roughly $6,800.00), the value of the wines she purchased ashore during port calls on the cruise that were confiscated and never returned (roughly $500.00), the loss of her Airbnb business for the time she was detained in Tahiti (roughly $50,000.00), the loss of income from her business of importing special wines from Europe (roughly $60,000.00), HAL's charge for services rendered while she was imprisoned in the medical center (roughly $16,000.00), and $9,000.00 so far as partial payment for the hospital bill. She anticipates that past and future expenses for treatment of her PTSD will add thousands of dollars to her damages. Some of her losses have been belatedly refunded, so there will be some offsets to these figures.

PLAINTIFF'S SECOND AMENDED COMPLAINT - 8

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

### First Claim for Relief: Assault & Battery

20. Defendant Chris "Doe" intentionally assaulted Aurelia as described in paragraph 9 above. She immediately and unmistakably refused his offer. Mr. Doe is, of course, responsible for his own behavior. There was a harmful and offensive intentional but nonconsenual touching of Aurelia, and it proximately caused her serious anxiety. Because sexual assaults on vessels are so commonplace and well-known in the cruise industry, there is case authority justifying strict liability against the vessel's captain or owner for a crewmember's sexual assaults. *See Doe v. Celebrity Cruise, Inc.*, 394 F.3d 891 (11th Cir. 2004). But even if some courts deem strict liability unavailable, case law also holds captains liable for the unlawful sexual torts committed by crewmembers on a negligence analysis, as captains owe their passengers a duty of reasonable care under the circumstances. *See Kermarec v. Compagnie Generale Atlantique*, 358 U.S. 625 (1959). *See also K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F. 3d 1041 (11th Cir. 2019) (particularly due to the availability of widely consulted Cruise Line Incident Reports revealing substantial numbers of reported sexual assaults in the cruise industry). On information and belief Captain Kramer/HAL knew or should have known that sexual assaults were a serious problem in the industry and on information and belief failed to take reasonable steps to guard against such assaults. On information and belief Captain Kramer failed to ensure that Mr. Doe was trained and supervised properly. More work needs to be done in discovery to determine who knew or should have known about the dangers of sexual assaults aboard cruise vessels, but the allegation as it pertains to the Captain and the company is certainly plausible and must be deemed true at this stage of the proceedings.

21.     Defendant Jim McParland, a vessel lecturer, assaulted and battered Aurelia in her cabin. She repeatedly had asked him to leave her cabin after he had returned a book he had borrowed from her, but he ignored those requests. As described in paragraph 20 above, on information and belief pending an opportunity to depose Captain Kramer and other officers, it is plausible that HAL's officers, including Captain Kramer, and other management knew or should have known that sexual assaults were common on the vessel. Pending discovery of any existing training program to address sexual behavior, on information and belief HAL and Captain Kramer are liable for failing to train or supervise defendant McParland properly. Defendant McParland himself is, of course, responsible for his own actions whether or not there is proof of liability against others. He touched plaintiff nonconsensually, and the touching was harmful and offensive to say the least, and that act proximately caused significant damages.

### Second Claim for Relief: Unlawful Imprisonment

22.     When on March 17, 2022, Aurelia was escorted to the vessel's medical center without her consent, as described in paragraphs 12-15 hereinabove, shortly after she had been told by vessel officers that she should pack her things and disembark from the vessel that night, she was frightened. She was held in the medical center for five days and five nights, without her consent and in defiance of her complaints and requests for opportunities to call her friends on the vessel and her husband, or even to be allowed to spend daily a few minutes outside in the sun. That restraint was unlawful imprisonment. The vessel's doctor, defendant Le Roux Viljoen, who was in charge of the medical center, had no authority to arrest or imprison Aurelia, and his actions and decisions to restrain her were an unlawful violation of her right of personal liberty and proximately caused her to suffer significant damages.

PLAINTIFF'S SECOND AMENDED COMPLAINT - 10

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

23. On information and belief, defendant Captain Kramer was likely consulted by Dr. Viljoen about his decision to restrain Aurelia against her will in the medical center. Discovery regarding that possibility has not yet been conducted, but if Captain Kramer authorized or approved Dr. Viljoen's false imprisonment of Aurelia, he should also be held responsible for damages flowing from that unlawful restraint.

### Third Claim for Relief: Conversion/Theft

24. Aurelia has a business at home that involves import and sale of fine wines from Europe. She also sometimes buys wines from her travels to other parts of the world and purchased several bottles during the Tahiti cruise. She had no intent of drinking or selling these beverages before she returned home. On information and belief, by the acts of the ZUIDERDAM's security chief, Darren, HAL confiscated these beverages on the vessel and never returned them to Aurelia. Darren's acts involved intentional interference with goods belonging to Aurelia. The beverages were converted, that is, retained unlawfully and never returned despite Aurelia's repeated requests. The property was worth only an estimated $500.00 to Aurelia, but she should be entitled to noneconomic damages as well because the conversion involved willful misconduct and caused Aurelia considerable frustration and anger.

25. On information and belief, HAL charged Aurelia's credit card, without her consent, roughly $16,000.00 for unrequested, unconsented, and unnecessary medical care during her imprisonment in the vessel's medical center between March 17 and March 22. That charge proximately caused her involuntarily to stay in Tahiti for many weeks without the funds to get home on her own, resulting on information and belief in a bill by the psychiatric hospital where she had stayed against her will for roughly six and a half weeks, in the amount of $89,000.00.

PLAINTIFF'S SECOND AMENDED COMPLAINT - 11

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

Aurelia suffered financial harm from the conversion of the beverages she hoped to sell at home as well as the charges for her so-called "care" in the medical center, and the enormous bill issued by the hospital in Tahiti that essentially provided her nothing more than a bed, as she refused medication or treatment while there.

### Fourth Claim for Relief: Medical Malpractice

26. Pending further discovery, but on current information and belief, Aurelia alleges that defendant Le Roux Viljoen, M.D., who consulted with a Florida osteopath for support of his diagnosis that Aurelia was manic and psychotic, had insufficient information and expertise to insist on her stay in the medical center, and failed to meet the required standard of care. On information and belief, Aurelia had no known prior history of mental disease. She had been told by the Hotel Manager on the evening of March 17, 2022, that she should pack all her belongings and leave the vessel that evening, book herself into a local hotel, and arrange to fly home to New York. On information and belief, Dr. Viljoen had himself told her she could return to her cabin to finish packing for her trip home if she simply allowed him to draw blood in the medical center. After she had been restrained in the medical center for five days, Aurelia was told by a nurse the 'good news' that she would be leaving the vessel to return home or continuing on the cruise, but shortly thereafter they strapped her to a gurney and took her to the local psychiatric hospital, HAL thus apparently washing their hands of any responsibility for her.

### Fifth Claim for Relief: Negligence/Gross Negligence

27. On information and belief, evidence will be produced at trial that defendant HAL knew or should have known that the psychiatric hospital in Papeete, Tahiti, to which on March 22, 2022, they delivered Aurelia for further observation and care, was a dangerous place for her to

PLAINTIFF'S SECOND AMENDED COMPLAINT - 12
**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

be, and they certainly had to know that as a female traveling alone, without family or friends able to visit her in the hospital, she was in a very vulnerable and dangerous position. In the course of deciding to leave Aurelia at the psychiatric hospital, they falsely imprisoned her, observed her for five days to ensure she did not try to escape the medical center, and then lied to her about their plans, communicating through one of the nurses at the end of her stay in the medical center that there was good news that she would either be sent home or allowed to complete the cruise, only to follow that communication shortly by strapping her to a gurney and taking her without her consent, or foreknowledge, to the hospital. Once she learned what was happening, upon arrival at the hospital, Aurelia refused to sign paperwork presented to her that stated she would agree to stay at the hospital and would be responsible for paying or cooperating in ensuring payment for their services.

28.   HAL cruises regularly called at Papeete, Tahiti. Whatever its reputation may be in general for safety of visitors, Papeete's psychiatric hospital is a depressing place to be and, on information and belief, a dangerous place for a woman without friends or family in Papeete, and the fact that she was raped three times in Papeete, twice by a male nurse in the hospital, and by a young man on some kind of probation at the mixed-sex shelter to which she was eventually transferred by the hospital because HAL had depleted her credit and had not arranged for her travel home to New York, despite their order on March 17 that she should pack her bags, go ashore, find a place to stay, and then return home without their help in any regard.

29.   Although cruise lines are often protected from complaints that they are responsible for injuries ashore when using independent contractors to transport vessel passengers to places of interest on shore excursions, they can be liable for failing to make clear to the passengers that

PLAINTIFF'S SECOND AMENDED COMPLAINT - 13

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

they are not responsible for what happens ashore. In the 2013 case of *Perry v. HAL Antillen NV, et al.* (W.D. Wash. 2013), in this court (CASE NO. C12-0850JLR), Judge Robart quoted the seminal *Kermarec* case (*Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959): "'It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew.'..." In our case from March 17, 2022, on, there was no third party confusing the question whether HAL can be liable for the faults of an agent or independent contractor causing harm to its passengers. In our case from the time Aurelia was falsely imprisoned in the medical center until she was deposited in the hospital in Papeete, HAL was making all the decisions and asserting control over every step taken by its passenger Aurelia. The *Perry* decision, involving a land excursion, says that the relevant inquiry is whether HAL "diligently inquired" regarding the fitness of the companies providing transportation on land excursions; surely, HAL should be subject to judgment whether it had diligently inquired regarding the safety of the psychiatric hospital in Papeete to which it was supposedly entrusting Aurelia for her care, her safety, and well-being for what turned out to be a more than six-week nightmare. On information and belief, plaintiff will be able to produce testimony mirroring what the witness told her after her ordeal, namely, that there was reason to worry that she would be badly mistreated in the hospital and/or shelters.

30.  HAL under the doctrine of reasonable care had a duty to familiarize itself with the history, operations, and reputation of the psychiatric hospital in Papeete before dropping Aurelia at its front door. If they knew or should have known it was a dangerous place to leave her, they should have arranged for her immediate flight home, with or without medical assistance, or allowed her to continue the cruise for which she had paid. By not doing either of those things,

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100

they had breached their duty of care, which proximately caused her enormous fear, anxiety, isolation, and vulnerability, and consequential financial losses.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for the following relief:

A.  For judgment against all defendants found liable for causing plaintiff harm in amounts to be proven at the time of trial;

B.  For prejudgment interest and statutory and reasonable attorney fees and costs in such amounts as the Court may deem proper and just; and

C.  For such other and further relief as the Court may deem appropriate.

DATED at Seattle, Washington, this 27th day of July, 2023.

LAW OFFICE OF JAMES F. WHITEHEAD

James F. Whitehead, WSBA#6319
Attorney for Plaintiff

PLAINTIFF'S SECOND AMENDED COMPLAINT - 15

**Law Office of James F. Whitehead**
PO BOX 84567
Seattle, WA 98124
(206) 448-0100